All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. The first case this morning is adjournment to the 7th, 1-3-4-4, Synthon IP v. Pfizer, the 7th. Good morning. May it please the court. The district court committed multiple reversible errors and abuses of discretion below. As but one glaring example, the court entered judgment based on the irreconcilably inconsistent jury verdicts, but the same process both anticipates under 102G, but does not infringe the exact same claims of the 401 patent. Significantly, either Pfizer or the district court even suggest that these findings can be reconciled, because they can't. Instead, they both argue waiver based on an improper reading of controlling precedent, which is explained in our reply brief at pages 31 and 32. You know, you list, as I counted, 13 issues for review. Yes, Your Honor. I apologize to you, but I am unable to keep in my mind 13 issues. Is it your view that all of these issues are of equal weight or non-weight, or is there one or two that you really think matter? And if so, could you tell me what you really care about in this case? Sure. We really care about what I'd like to turn to first are the exceptional case finding and the finding of equitable conduct. So the rest of it is just sort of shotgun, hoping maybe you'll tip one of us off on some other side issue. No, Your Honor. We also do think that those are all errors. And in fact, we think that the entry of a judgment based on irreconcilably inconsistent special verdicts can rise to a constitutional 19 with respect to the 7th Amendment right. And therefore— The real problem is that you've lost on multiple grounds. Well, we would need to overturn the equitable conduct finding, I agree. But with respect to judgment based on— Well, I think under controlling the Fourth Circuit and Supreme Court precedent, if you can't reconcile the verdicts, then the whole verdict is— No, I understand, but that's your argument. I mean, the reason you're raising so many issues is you lost on all 13 issues. Yes, we did. Admittedly. But they're not all of equal significance. Is that your view, or do you want to argue all 13? We're not going to argue all 13 today in 15 minutes. In the limited time that we have today— But you do maintain that every one of them goes to the outcome of the case. That you have to examine all of them in order to get on this case. I don't think so. I think that— That's why you're here, Your Honor. I believe that maybe the listing of the 13 issues in the opening brief, some of them may have been actually duplicative. Some of them may have been— Duplicative. Duplicative? Yes. Oh. I believe to overturn— You're helping us by giving us lots of things to— Forget it. Move on. Sure. In the limited time I have today, I would like to focus on the grave errors in the District Court's exceptional case findings and inequitable conduct. Permeating the District Court's and FISER's inequitable conduct and exceptional case analyses are unfounded conspiracy theories. When viewed in light of Senton's open-handed and extensive interactions with FISER relating to the very patents in suit, both during and after their prosecution and before this lawsuit was filed, those conspiracy theories disappeared. This is not a case of Senton being the surreptitiously copying FISER and then blindsiding it with a baseless infringement lawsuit in an attempt to extort money from FISER for FISER's work. This is a case where Senton independently invented the subject matter of the patents in suit and threw out— What's wrong with the inequitable conduct finding? The District Court found that the lawyer who was prosecuting these actively did a favorable finding, recall. But his inequitable conduct finding relates to the guys who were the inventors and people who were supervising them. So the fact that the prosecutor's attorney tried to get information from FISER and behave honestly was not in the District Court's view of defense because of the conduct of the inventors and their supervisors. What's your response to that? Well, I think there are several. I think with respect to Dr. Horn, he was not somebody that owed a duty of Rule 56 with respect to the prosecution of these patents. He was not an inventor. He was not substantively involved in the preparation of the prosecution of these patents. His only involvement was, unknowingly, he was listed erroneously as an inventor on the very first provisional application. He was never listed as an inventor on any of the succeeding non-provisional applications. He didn't supervise or involve himself in the development of the invention? No, he did not. Really? Yes. He signed some notebook entries of one of the inventors before that inventor actually worked on his invention. He was involved in the Amlodovine Project in general, and he was an inventor on other applications that were in that project. There were eight provisional applications filed on the same day, and he was an inventor on one of those. Well, the way of finding, by the District Court, finding facts is supervised, right? He was. At certain points in time, he was a supervisor, but that does not mean that he was substantively involved. He had a finding of fact, right? Maybe wrong, maybe clearly wrong, but he had a finding of fact, that he was a supervisor within the meaning of the PTO rules. Well, the PTO doesn't say that supervisors owe a Rule 56 duty. It says that folks that are substantively involved in the preparation of prosecution or who are inventors, and he wasn't one of those. But don't we have a finding of fact that he was substantively involved? And that's erroneous. Right. So that's why I'm asking you that. Yes. We believe that that's an erroneous fact finding. Right. So if we disagree with you on that, and we conclude that we should sustain that fact finding, where are we on the inequity? I still think that there's no intent to deceive established even by Dr. Horne. Because? Because there's no evidence that he intended to deceive the patent office. He wasn't attempting to obtain anything from the patent office. He wasn't involved in the prosecution. He didn't even know he was listed as an inventor, except for a meeting in February after the first provisional was filed, where he was made aware that he was listed as an inventor on this first provisional application, and it was clearly determined that he shouldn't have been. And then he was deleted as an inventor or not included as an inventor in the next filing. And that was his only involvement in the prosecution. Am I mistaken, but wasn't he just one of the people who had copies of these documents? Were there other copies? I think it depends on which documents you're referring to. I think the district court glosses over and tries to paint everybody that was involved collectively with any document that's in the company's files. And that's not correct. But there were other copies in the company's files. In the company's files. But under controlling precedent, that's not sufficient to establish an intent to deceive on the part of a particular individual. Furthermore, I think when viewed in light of the context of the interactions between Pfizer and Synthon, it's clear that there would be no reason for withholding SPD or any other Pfizer product from the patent office. Specifically, starting in 2001, Pfizer and Synthon were involved in licensing negotiations related to Synthon IPs and Lodipine projects. And in fact, Pfizer purchased foreign rights to certain related and Lodipine IP. And three months after the application that led directly to the court, yes, Your Honor? Three months after they filed that application, they provided a copy of the application which was confidential to Pfizer. And Pfizer subsequently, five months later, provided a copy, a two-page excerpt of DIA, which is one of the recruiting brochures that Pfizer contends anticipates the 481 claims. Importantly, they didn't provide the entire publication. And they didn't even provide the second page which would have included the copyright notice and a date. And for three to four years after obtaining that excerpt, Mr. Boucher and Synthon attempted to get any information that Pfizer would give them with respect to I mean, suppose Pfizer was completely uncooperative. They didn't allow the patient to be cooperative. How can that excuse inequitable conduct if they weren't cooperative? I don't believe it excuses inequitable conduct. I do think that it makes it a prize that there's an injustice because they had to pay for attorney's fees in this litigation or in TALA. If they had provided information that DIA and SDB to Mr. Boucher were available as prior art, and that was information that they had that was readily accessible to them, it was difficult for anybody else to determine, then this lawsuit may not have been filed. In fact, Mr. Boucher attempted to obtain that information. But the attorney's fees are based primarily on inequitable conduct before the patent office. Not with respect to Synthon IP. The district court relies almost exclusively on litigation misconduct in bringing a basis lawsuit because Synthon IP purchased the patents in suit from Synthon BB. Synthon IP was not aware of the inequitable conduct. In fact, Mr. Boucher was clear, completely insulted. Can you tell me where the opinion says that because that's not mine. I believe that was- There is a reference in there to- Maybe JA-17. There is a reference in there to baseless conduct. But I thought that with respect to the attorney's fees that Synthon IP did was basically that there was inequitable conduct and that they were responsible for the inequitable conduct of this affiliated company. Am I mistaken about that? I believe it's the footnote that bridges. I'm not sure if it's JA-17. Hopefully I can find that out and let you know during my rebuttal time, which I believe I'm cutting into. But I believe it's the footnote that bridges the pages because Mr. Boucher, who is now the president of Synthon IP, was absolved of any involvement in inequitable conduct, had no knowledge, had no reason to know of any inequitable conduct. And the court says, well, Synthon IP is not sufficiently removed from inequitable conduct because of litigation misconduct, because they shouldn't have brought this lawsuit. However, Mr. Boucher, for months prior to filing the lawsuit, attempted to find out more information on DIA, even in 2005. And yet, immediately after filing the lawsuit, FISER knows who to contact in order to get information that DIA and this other recruiting brochure, STD, are part of. And they don't give that information until they close the fact discovery. I just don't agree with the opinion of it. So if you can show me the way that you documented this equivocation in this conduct operation. Okay. Thank you. I'll do that. Mr. Boulidoff? Thank you. The central issue in this case, I think, is inequitable conduct. Perhaps, but address first the new political crimes. Because it really does seem to me as a problem. That there is an inconsistency between the non-infringement words and the invalid words. At least as to anticipation. No, I don't think there is, Your Honor. How can they be reconciled? Because they're both based on what FISER is doing, right? Well, they were both based on work of FISER. And the reason that I say that there, in my view, is not an inconsistency, is because when you look at Sandwich Drug Discoveries, for example, which is one of the grounds for a 102 A and B invalidity holding, that's different than what was going on at FISER's plant. The question on infringement is, what was FISER doing at its plant? And the jury found and the judge upheld that FISER was not isolating the compound of Formula 3 in its commercial process in Barcelona. That's one issue. When you get to the invalidity, the anticipation holdings, we're talking about something different, which is, here is a document that FISER published more than a year before the patent. It describes generally the same process. Because it doesn't give the general details of what's going on in the plant. What it shows... The difference, and what I think reconciles the verdicts, is that the document simply shows a two-step process with the compound of Formula 3 standing alone. And their own inventor, Mr. Benninger, looking at that, said that that suggested isolation. What was going on in FISER's plant was different. What was going on in FISER's plant was something which left the compound of Formula 3 in a mixture with all of the other things from the crude reaction mixture, so that only 40 to 60% of it was the compound of Formula 3. So there's something... There is a big difference between what's shown in a prior art document and the proof. What's the big difference? The difference is that the prior art document doesn't say 40 to 60% of what's in this box is the compound of Formula 3, whereas the evidence from what's going on in FISER's plant does show that. Assuming there is an inconsistency between the infringement verdict and the anticipation verdict, would that also be true invalidity based on obviousness? No, I don't think so at all, Your Honor, because the testimony was very clear on obviousness that what FISER was doing was using a known method, applying it to a known compound, the compound of Formula 3, to come up with a known result, and that was what Dr. Ager, their own witness, testified to. So even if it wasn't anticipated, the evidence of obviousness, I think, is very plain. The problem, it seems to me, is the obviousness testimony. In a sense, I read that, and they say it's obvious to remove the solvent, which is not sufficient to satisfy the claim limitations under the District Court's alternative number one. Is that not correct? I don't think that was the testimony, Your Honor, from Dr. Ager, from Synthon's expert. Synthon's expert testified, and our own expert, Dr. Bartlett, testified that isolation was a well-known chemical procedure and that Dr. Ager testified that what was happening was simply the application of a known procedure, isolation. He didn't apply the method. He was talking about the known procedure for removing the solvent, which does not satisfy the claim limitations under the interpretation of the claims that you were propounding. Isn't that correct? No, I don't think that is correct. I don't think in the context in which he was asked that question that it was about, solely about, distillation. I think that the question to him was about isolation, and isolation gave him that. Well, it was in general terms, but then he went on, and if you looked at the citations from John Greif at 58 to 60, he went on to make clear, according to my reading, that in his view, something is isolated when the solvent is removed, which is the law of construction, right? Well, that was one of the ways of isolation. I don't think that Dr. Ager or Dr. Bartlett testified that distillation, in Dr. Ager's opinion, was the only way to isolate a chemical compound. It was just one of the ways that, in his opinion, you could do that. But there were other ways. Distillation is removing only the solvent. It is. In this context, it's removing only the solvent. That's correct. But nevertheless, isolation, no matter how you define it, was a well-known procedure. Isolating chemical compounds isn't new, and he was simply asked about isolation and testified that isolation of novenagel compounds, the type of compound we have here, was something that wasn't new, that hadn't been invented by synthon, that other people had done before, and we put into evidence prior art patents, I believe the Satto patents and Satto papers, which showed isolation of novenagel compounds and not talking about distillation, talking about actual isolation of those compounds. If we were to uphold the district court's inequitable conduct position in terms of the attorney's view, what would then be the proper disposition of the attorney's view of the issues? I think, based on what this court did in the Monsanto versus Barr case and the Eastgate case, both of them last year, that the court found that if it affirmed the inequitable conduct, it didn't have to get to any of the other issues because the magnitude of patents were unenforceable, and I think that is the proper result here. There is no reason to go past that, and I would like to talk about the inequitable conduct for a couple of minutes because Judge Ellis expressed findings that synthon's advocates copied. What they knew was Pfizer's chemical route to make mROTP, including the compound of Formula 3. He found expressly that they put that into a patent application. He found, he had to find, that they told the patent office that the compound of Formula 3 was new in their invention, and he found expressly that they withheld from the patent office every document in their files that showed that that wasn't true, and those findings were in a 39-page opinion based on evidence including that synthon had the 1998 and low-doping page from Sandwich Drug Discoveries which showed the compound of Formula 3, which showed Pfizer's chemical route, and it wasn't just Dr. Horn. It was Dr. Horn, Dr. Slimina, that synthon, Dr. Horn, and Dr. Peters, and in fact, Dr. Peters' signature, Dr. Peters is the name inventors on one of these documents, that they wrote down in the summer of 1999, Pfizer's chemical route including the compound of Formula 3. They wrote it down in two documents before they even started their work in the lab, before they did anything, and before they claimed to have invented the compound of Formula 3. Well, the record seems to support much of what the trial judge found, but that still leaves the question of intent hanging out there. What's your view of the trial judge's intent? And what the judge found was that not only that there was clear convincing evidence of intent, he went farther and said that there was no reasonable doubt that the applicants and Dr. Horn intentionally failed to disclose to the patent office, and the basis for that was... But Dr. Horn didn't have an obligation to disclose. I'll get to that in a minute, but if I can answer your intent question. The documents show clearly, including, and I want to get on the intent question, the route according to Pfizer, is Dr. Benneker had that, Dr. Horn had it, Dr. Slamina had it, and Dr. Benneker, I guess it's actually Mr. Benneker, he emailed it to Dr. Horn's assistant in the summer of 2000 while the patent application was being drafted, and then he claimed four months later that it was new and it was his invention. It said route according to Pfizer. The intent element was based on these documents. It was based on internal SINFON documents which attributed this to Pfizer. There were three documents, the OPIN, which said it was based on a product forward from Pfizer, the DLOC, where Dr. Horn wrote in his notebook, should I put route Pfizer in the DLOC, and then he did, including the reagents from Sandwich Dog Discovery and the other details, and route according to Pfizer, which attributed it on its face to Pfizer. When Mr. Benneker gave that to Mr. Bush or the attorney, he gave him the chemistry, he left off the route according to Pfizer part. Now, when you make an argument to the patent office that something is new in your invention, and you have at least three documents internally which say this was Pfizer's, and we knew it was Pfizer's, and two of them are dated before they even made their invention, I think the court is entitled to infer that there was intent there, but there's more than that, because we asked each of these witnesses, what's the explanation? How did you write this document? How did you write this down? Where did this come from? Not a single person had an answer. I don't recall, I don't know. Those were the two things. People who signed, inventors who signed documents before they made the invention, showing the compound of Formula 3, and not having any explanation other than I don't remember this document, and Judge Ellis, as he was entitled to do, and rightfully did, found that that testimony wasn't credible. And when someone writes something down in a document that's totally inconsistent with what they tell the patent office, and then all it says is don't know, don't remember, I think there's full case support for finding that there was intent to deceive. I don't know what more intent to deceive you could have had other than a person coming in and saying, yes, I intended to deceive, and the testimony totally inconsistent with the documents. On the Dr. Horne question that you asked, Dr. Horne was someone who, as Judge Zeit pointed out, Judge Ellis found specifically was substantively involved in the patent prosecution. He was a named inventor on the provisional. The first time that a different group of inventors was named was in January of 2002 after there were two continuations, but he was head of the project. Three of the four inventors reported to him. He did literature searches for the inventors. He reviewed the patent search reports. And I think most importantly, to say he wasn't substantively involved when the record is clear that in early 2001, the attorney, Mr. Busher, had telephone conversations with the entire group, with Dr. Peters, with Mr. Benecker, with Dr. Horne, and the others, to talk to them about the patent application, to go through the claims with them, to find out who the inventors were. And he, in fact, told Dr. Horne that he had a duty of candor and that he had to disclose anything that was material. But putting all of that aside, even if Dr. Horne didn't have a duty, I think there's certainly not a clearly erroneous factual finding on that. That doesn't get around to Mr. Benecker and Dr. Peters telling the patent office that the compound of Formula 3 was new in their invention when each of them knew that wasn't correct. Because Dr. Peters signed a document in the summer of 1999 that showed it wasn't correct, and because Mr. Benecker had on his computer a route according to Pfizer that showed it wasn't correct, and there's no explanation for that. I have only one other thing that counsel said that I'd like to respond to, and that is the suggestion here on exceptional case that there were open dealings between Pfizer and Synthon. And if Pfizer had just told us these things, maybe there wouldn't have been litigation. Well, the things that were the basis for the inequitable conduct, that Synthon had sandwich drug discoveries, that Synthon had the OPIM, that Synthon had the VLOC, that Synthon had the route according to Pfizer, Pfizer didn't know any of that. In fact, Synthon, without telling Pfizer that, was trying to get Pfizer to pay them a lot of money for this patent application without telling them any of that. So the notion that this was an open process and, oh, we were telling Pfizer everything just doesn't work. And... Is the attorneys' case a work based on inequitable conduct  It was based on both, Your Honor, and I think the little border on that makes it clear that the judge first goes into inequitable conduct and says this would be an exceptional case based solely on inequitable conduct. But he then does find litigation in this conduct, and I think that's an interesting point, because when Mr. Busher testified that he learned about... What's his name again? Mr... No, the human... The district court's finding on the human... I believe it's at Joint Appendix 63. But on the litigation misconduct, if I can just finish that up, Mr. Busher testified, this is Joint Appendix 1780, that by the summer of 2005, he knew about sandwich drug discoveries and the related documents in Synthon's files. When we went to them after we found out about them in litigation and we said, drop the case, they said, no, we're going to seek hundreds of millions of dollars and an injunction from you. And that's at Joint Appendix 63-32. And... I'm down to nine seconds, but that's all I had to say anyway, unless there are other questions. I have one quick question. This is a... There was no jury. The general jury for this 49A case rather than the 49B case. I believe that this was a special verdict because there was not just a who wins, who loses. 49A. I don't have the rule numbers. Thank you. Thank you. Just briefly, the portion of the Joint Appendix that relates to the exceptional case planning is at JA 62-64. Yeah, and then on 62, the judge said Synthon's inequitable conduct before the BPO was alone was sufficiently to count for when this case is settled. Yes, Your Honor. However, the party that was found guilty of inequitable conduct was Synthon B.B., which is not the plaintiff in this lawsuit. The plaintiff in this lawsuit is Synthon I.P. who purchased the patents for good and valuable consideration  should be held accountable for Pfizer's attorney's fees because if Synthon B.B. is not paying for those fees that would be coming directly from Synthon I.P., the court says it's because they brought what they should have known as a baseless litigation. And we think that that's clearly a wrong use, that there was no way that Mr. Boucher and Synthon I.P. could have known about this information or should have known or that this lawsuit was baseless. With respect to the inconsistent verdicts, I'd just like to point out that if you find that there's irreconcilably inconsistent special verdicts, you're not free to just go in and pick it. The district court's not free to just go in and pick and choose which of those special findings to give weight to. In fact, you must throw out the whole verdict and you can't enter judgment based on that. That's error and the precedent that controls that is Ladner v. Murray from the Fourth Circuit as well as Gallup v. Villanueva, a 1963 case from the U.S. Supreme Court. And those are cited in our reply brief, I believe at pages 31 and 32. Ms. Stafford, I was struck, as was Jeff Ellis, with regard to a report on Mr. Blumenthal, that your witnesses never had any explanation for how these documents ended up in the files and all of that. Is that a correct reading of the record that there was never any explanation? I think it's an oversimplification that's based on lumping all the individuals together just as the opposing counsel just did. For example, he said that they wrote it down that Pfizer had invented it. Did any of them have an explanation? Well, Dr. Benneker never saw one, testified he never saw the DLOC. He never saw OPIM. The route Pfizer, he didn't recall it, but that document was dated 10 months after his conception. The question is, did anybody offer an explanation? Is Judge Ellis correct that nobody offered an explanation for these documents in your files? Well, I think it depends on an explanation of what. I mean, Dr. Benneker testified he never saw those documents, so how could he explain why he didn't provide it to the patent office? He didn't see it, so he couldn't have provided it. Dr. Salamina only saw an undated excerpt of STD, and it was after, six or seven months after, he'd been informed that Dr. Benneker had invented this two-step process. So he had no reason to know that this was something that were related to Pfizer's work before Dr. Benneker's invention or not. That leaves Dr. Peters. And the three documents I'd like to walk through is, first, the DLOC document. That was not authored by Dr. Peters. It was not authored by Dr. Horne. It was not authored by any of the inventors. It was not found in any of the inventors' files. And Dr. Peters testified that he didn't recall ever seeing it. It's a draft. It was never signed. It was never approved. And it does not attribute the synthetic revalidant in that document to Pfizer. Never mentions it. With respect to OPIN, that was a document that was created primarily to help obtain regulatory approval at a time when Synthon was not interested in actually making the amyloidopine, but was interested in actually purchasing it, and therefore was studying impurities and metabolites. It was not found in any of the inventors' files. It was not a widely circulated document that was used by the research and development team. And Dr. Peters recalled that he must have signed it, but he surely doesn't recall ever reviewing it. He never saw SDV, and SDV was never found in his files. Thank you very much. Thank you. Thank you so much.